684 A.2d 23

**Angelo C. GUARINO**

v.

**Helene A. GUARINO.**

**No. 1852, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Oct. 31, 1996.

2

Jeffrey N. Greenblatt (John S. Weaver and Brodsky, Greenblatt & Renehan, Chartered, on the brief), Gaithersburg, for Appellant.

Deborah E. Reiser (Deckelbaum, Ogens & Fisher, on the brief), Washington, DC, for Appellee.

Argued before WENNER and CATHELL, JJ., and PAUL E. ALPERT, Judge (Retired), Specially Assigned.

PAUL E. ALPERT, Judge, Specially Assigned.

In this appeal, Angelo C. Guarino, appellant, challenges an award of alimony *pendente lite* and initial attorney's fees to Helene Ann Guarino, appellee, by the Circuit Court for Montgomery County. He brings to our attention four allegations of error:

I. Did the Chancellor err in granting any alimony or counsel fees to Mrs. Guarino where Mrs. Guarino had no cause of action and had no probability of success based upon the causes of action she alleged in her pleading?

II. Did the Chancellor err in granting any alimony, let alone $3,500.00 per month, to Mrs. Guarino where Mrs. Guarino's needs did not require such an award of alimony, the Chancellor failed to properly exercise his independent judgment, as required by *Domingues v. Johnson,* 323 Md. 486, 593 A.2d 1133 (1991), to determine Mrs. Guarino's reasonable needs, Mrs. Guarino was capable of contributing financially toward her own support, Mrs. Guarino had voluntarily impoverished herself, and Mr. Guarino lacked the ability to pay alimony?

III. Did the Chancellor abuse his discretion in awarding retroactive alimony where the award represented 90% of Mr. Guarino's income earned during the retroactive period, the Chancellor failed to consider the funds that Mrs. Guarino had taken from the parties' bank accounts, Mrs. Guarino's ability to support herself as further shown by her only nominal debts since the parties' separation through the date of [the] hearing?

IV. Did the Chancellor err in awarding initial counsel fees where Mrs. Guarino had already paid her attorney a fee with the parties' joint funds and the retroactive alimony gave her further ability to pay her attorney additional means?

When shorn of verbiage, appellant's issues are: did the chancellor err in granting (1) alimony *pendente lite* and (2) initial attorney's fees to appellee.

On August 15, 1994, appellee filed a complaint for limited divorce, alimony, and other relief, to which appellant filed an answer. The case proceeded to a hearing on January 27, 1995, during which the master heard testimony from appellee, appellant, and two expert witnesses, received exhibits, and entertained arguments. Thereafter, on April 20, 1995, the master filed her Report and Recommendations. We shall recount the relevant portions of her findings.

On August 11, 1994, after some thirty-three years of marriage to appellant, appellee, who was in her fifties, left the couple's marital residence with only her purse and family automobile. Thereafter, she returned to collect personal belongings and assorted documents.

Prior to her departure, and going back to 1979, appellee had worked alongside appellant in the couple's corporation, Guarino Corporation. When she left home, her paychecks from the corporation were terminated.

Lacking the financial resources to obtain housing, appellee sought and obtained shelter with her father in Pennsylvania and family and friends in Maryland. She borrowed money from her father and cashed in a $3,100.00 life insurance policy to meet her living expenses. Appellee also withdrew $7,500.00 from a joint savings account, which amount she paid to her legal counsel as a retainer. Appellant provided appellee $750.00 at Christmas and an additional $1,000.00 the week before the January 27, 1995 hearing.

Appellant, who remained in the eleven room, three and one-half bath Potomac, Maryland marital home, refused to provide appellee with any support apart from the $1,750.00. He

liquidated $33,000.00 residing in the couple's joint investment account and deposited the couple's joint tax refund into his own account. Subsequent to appellee's departure, and contemporaneous to appellant's dominion of the aforementioned monies, he spent $8061.00 on home improvements and furnishings, and undertook other home improvement projects.

Financial records relating to the couple's personal and business dealings and testimony as to the corporation's financial status revealed that appellant, "without question," had the financial resources to contribute to appellee's financial needs during the *pendente lite* period. Appellee, who was not in a position to support herself during that period, had reasonable needs of approximately $3,500.00 per month. Furthermore, appellee's homelessness and inability to support herself constituted extraordinary circumstances justifying an entry of an immediate order for *pendente lite* support from the date of the hearing, January 27, 1995, onward.

Appellee incurred $12,403.11 in attorney's fees and expenses, of which she paid $7,385.61 from joint funds. Five thousand seventeen dollars and fifty cents remained outstanding, in addition to $2,500.00 she paid as a retainer to an expert for the purposes of valuation of marital assets.

In light of those findings, the master recommended that the chancellor order appellant to pay appellee alimony *pendente lite* of $3,500.00 per month, commencing from August 15, 1994, and $7,500.00 for initial attorney's fees and costs.

The very next day, April 21, 1995, the chancellor signed an Immediate *Pendente Lite* Order, in which, among other things, he ordered that appellant pay to appellee "as *pendente lite* alimony the sum of $3,500.00 per month, commencing and accounting from February [sic] 15, 1995. . . ." Appellant filed exceptions to the Master's Report and Recommendations. On July 19, 1995, the chancellor heard exceptions to the Report and Recommendations. Nine days later, the chancellor issued an Order overruling appellant's exceptions to the master's Report and Recommendations. To preserve his appellate posture, appellant timely noted an appeal from the overruling of his exceptions.

Thereafter, appellant filed a counter-complaint for Absolute Divorce and appellee filed an amended and supplemental complaint for Absolute Divorce. The issues of alimony *pendente lite* and initial counsel fees remained unresolved until May 2, 1996, when the chancellor signed an Order granting to appellee alimony *pendente lite* of $3,500.00 per month from August 15, 1994, entered judgment against appellant in the sum of $15,750.00 for unpaid alimony *pendente lite*, credit given for the $1750.00 given to appellee, and ordered that appellant pay to appellee for initial counsel fees $7,500.00. On the ninth of May, appellant noted an appeal to this Court.

## I. *Alimony*

■ Appellant crafts his first assault on the chancellor's judgment from our quotation of *Nelson on Divorce and Annulment* (2d ed. 1945). We quoted that work in *Maynard v. Maynard*, 42 Md.App. 47, 50, 399 A.2d 900 (1979), which, in turn, we quoted in *James v. James*, 96 Md.App. 439, 450–51, 625 A.2d 381 (1993). In *Maynard*, we noted the differences between alimony *pendente lite* and permanent alimony and cited to *Nelson* for the rationale underlying an award of alimony *pendente lite*. Section 12.24 of *Nelson*, as quoted in *Maynard*, read as follows:

> The applicant for the allowance must show, at least prima facie * * * in order to obtain an allowance pendente lite of temporary alimony, allowance for support of children, and/or suit money, including counsel fees, (1) the pendency of the matrimonial action in which the allowance is sought; (2) the existence of a marriage between the parties; (3) a probable cause of action or defense on the part of the applicant, with reasonable probability of success of the applicant on the trial; (4) financial inability of the wife to support herself and/or to prosecute or defend the action; and (5) the ability of the husband to make payments.

*Maynard*, 42 Md.App. at 50, 399 A.2d 900.

In *James*, the alimony issue before us was whether the chancellor should have considered educational expenses in

making a *pendente lite* or temporary alimony award. In addition to quoting from *Maynard* for the quotation of *Nelson*'s factors found therein, we utilized those factors as if they were legitimate.

In the case *sub judice*, there is no dispute as to the pendency of the matrimonial action in which the allowance is sought, the existence of the marriage between the parties, a probable cause of action or defense on the part of the appellee with a reasonable probability of his success at trial, and the ability of appellant to make the payments.

*James,* 96 Md.App. at 453, 625 A.2d 381.

Appellant latches on to the third *Nelson* factor and contends that the master ignored that factor, along with the others, and that appellee's evidence "was totally insufficient to meet the requirements for 'a probable cause of action with reasonable probability of success.'" His foothold is of our own making.

The Court of Appeals has not issued writs of *certiorari* for either case or cited the same. Our review of the citations to each case, all from this Court, reveal that no mention is made of the *Nelson* factors. *See Payne v. Payne,* 73 Md.App. 473, 482, 534 A.2d 1360, *cert. denied,* 312 Md. 411, 540 A.2d 132 (1988) (*Maynard* ); *Rosenberg v. Rosenberg,* 64 Md.App. 487, 535, 497 A.2d 485, *cert. denied,* 305 Md. 107, 501 A.2d 845 (1985) (*Maynard* ); *Bender v. Bender,* 50 Md.App. 174, 182, 436 A.2d 518 (1981) (*Maynard* ); *Bunn v. Kuta,* 109 Md.App. 53, 69, 674 A.2d 26 (1996) (*James* ); *Lemley v. Lemley,* 102 Md.App. 266, 276, 649 A.2d 1119 (1994) (*James* ); *Reuter v. Reuter,* 102 Md.App. 212, 229, 649 A.2d 24 (1994) (*James* ); *Speropulos v. Speropulos,* 97 Md.App. 613, 617, 631 A.2d 514 (1993) (*James* ).

The third *Nelson* factor is in direct opposition to Maryland common law. In *McCurley v. McCurley,* 60 Md. 185 (1883), the Court recognized that an award of alimony *pendente lite* is made without an inquiry into the merits of the underlying action.

[T]he chancery practice in this State, resting upon adjudicated cases, is so well settled that recourse to other authori-

ty is unnecessary to show that the right of the wife to require her husband, when she is living apart from him and without means of her own, to defray the expenses of prosecuting her suit for a divorce, is almost a matter of course, independently of the actual merits of the case; the Court exercising its sound discretion as to when and to what extent, as it may be advised in the progress of the case, such allowance shall be granted.

*Id.* at 188–89. The Court cited to, among others, the cases of *Daiger v. Daiger*, 2 Md. Ch. 335 (1850), *Buck ex rel. Coles v. Coles*, 2 Md. Ch. 341 (1851), and *Tayman v. Tayman*, 2 Md. Ch. 393 (1851), for that proposition.

In *Coles*, Mrs. Coles had come before the chancellor, John Johnson, praying for alimony *pendente lite* and for means to defray the costs and expenses associated with her suit for a divorce *a vinculo matrimonii*. At the outset, chancellor Johnson noted the possibility that Mrs. Coles' suit might lack merit.

It may turn out that the grounds upon which the interposition of the court is asked in the original bill, are not sufficient, even if established by the clearest proof, to entitle the party to a decree dissolving the marriage, though, in that event, a qualified divorce may be granted, if the causes proved to be sufficient to entitle the complainant to that relief. . . .

*Coles*, 2 Md. Ch. at 346.[1] He then referred to the general rule pertaining to the granting of alimony *pendente lite*

The general rule is clear and undisputed, that the wife, in these cases, is a privileged suitor, and that the court, without inquiring into the merits, and whether she be plaintiff or defendant, will allow her alimony, *pendente lite,* and a sum for carrying on the suit. The rule is believed to be almost universal, to allow a destitute wife, who has been abandoned, or is living apart from her husband, temporary

---

1. Indeed, after a final hearing on the cause, Chancellor Johnson concluded that Mrs. Coles did not support her case for a divorce *a vinculo matrimonii* or *a mensa et thoro*. *Coles,* 2 Md. Ch. at 351–52.

alimony, and the means of prosecuting or defending a suit for divorce, and this without any inquiry whatever, into the merits.

*Id.* at 346–47.

Chancellor Johnson's conclusion was grounded upon the research he conducted for *Daiger.* In *Daiger,* a case wherein a wife petitioned the Court for an allowance of alimony *pendente lite* and money to pursue her suit, he candidly observed that

[m]y impression, when the petiti on was first presented, was, that the court, at this stage of the cause, might, to some extent, at least, examine into the merits, and the order of the 12th of November last, authorizing the parties to take depositions, was passed under that impression, but, upon looking into the authorities, I have come to the conclusion, that such is not the practice, and that if an examination was instituted now, and a decision made, adverse to the application of the wife, it might have the effect of defeating her suit altogether, before the usual opportunity has been afforded of developing the full merits of the case; for if it be true, and in the absence of proof to the contrary, it must be assumed to be true, that she has no means of living, or of defraying the expenses of the suit, and if the court, upon a preliminary proceeding like the present, and before she is furnished with the means of procuring the attendance of witnesses, undertake to investigate, and decide upon the merits of the case, it is obvious that very few suits by married women against their husbands, can ever be prosecuted successfully.

*Daiger,* 2 Md. Ch. at 336–37.

Chancellor Johnson continued:

The application presupposes, and is founded upon the allegation, that the wife is destitute of the pecuniary means of carrying on her suit, and, therefore, at that stage of the cause, to require her to show merits, or to engage in a contest with her husband, in regard to merits, would expose her to almost inevitable defeat, not only in the particular

application, but at the final hearing, for which, if her prayer for money to conduct the suit fails, she would be wholly unprepared.

*Id.* at 337.

The decision in *Tayman* is in accord with that of *Daiger* and *Coles.*

And it must also be considered as settled, that upon an application by the wife for temporary alimony, and for money to carry on the suit, the merits will not be looked into, the allowance being made almost, if not entirely, as a matter of course. Such was the conclusion to which I came in the case of *Daiger vs. Daiger,* after an examination of numerous cases in this country and in England.

*Tayman,* 2 Md. Ch. at 397.

In 1947, in *Dougherty v. Dougherty,* 189 Md. 316, 55 A.2d 787 (1947), the Court of Appeals favorably quoted from *Coles* and pointed to the integrity of that decision.

That case [*Coles* ] has repeatedly been quoted or cited and followed by this court. Wives found to be at fault both by the lower court and on appeal have been held entitled to alimony, as well as 'suit money' (including counsel fees), pending appeal.

*Dougherty,* 189 Md. at 320, 55 A.2d 787. The Court of Appeals acknowledged the *Daiger/Coles/Tayman* principle eight years later in *Frank v. Frank,* 207 Md. 124, 130–31, 113 A.2d 411 (1955).

This Court is also aware of the principle. *See ·Carney v. Carney,* 16 Md.App. 243, 253, 295 A.2d 792 (1972); *Stenger v. Stenger,* 14 Md.App. 232, 244, 286 A.2d 552 (1972). We have stated that the "purpose of alimony *pendente lite* is to maintain the status quo of the parties pending the final resolution of the divorce proceedings," *Speropulos,* 97 Md.App. at 617, 631 A.2d 514, and that the award "is based solely upon need." *Komorous v. Komorous,* 56 Md.App. 326, 337, 467 A.2d 1039 (1983).

With the passage of what is now § 11–101 of the Family Law Article, the duty by either spouse to pay alimony became statutory. *Hofmann v. Hofmann*, 50 Md.App. 240, 244, 437 A.2d 247 (1981).[2] Section 11–102 of that Article empowers the chancellor to award alimony *pendente lite* to either party, but provides no guidelines for making that award as found in § 11–106, which pertains to alimony. As explained in *Maynard:*

It is perfectly apparent that all the factors which a chancellor must consider in a divorce proceeding looking to an award of permanent alimony cannot be developed in a preliminary hearing which forms the basis of an award pendente lite. It is only after a full and complete hearing on the merits of the respective claims of the parties that a chancellor is in a position to formulate a judgment which has a greater degree of permanency than the judgment he pronounces after a hearing on temporary alimony.

*Maynard*, 42 Md.App. at 51, 399 A.2d 900. Consequently, the rationale for granting an award of alimony *pendente lite* remains within the sound discretion of the chancellor and based on the need of the party seeking alimony *pendente lite*. Indeed, it appears from a fair reading of *Daiger, Coles,* and *Tayman* that the wife was a "privileged suitor" because she was "without means" or "destitute of the pecuniary means of carrying on her suit."

We are convinced that a retreat from our previous citations to *Nelson*'s third factor, in the context of an award of alimony *pendente lite*, is in order. The Court of Appeals has recognized, adopted, and not strayed from the principle announced in *Daiger, Coles,* and *Tayman* that a chancellor shall not evaluate the merits of the petitioning spouse's case before

---

2. Although a constitutional question is not before us, we are aware of the Equal Rights Amendment to the Maryland Declaration of Rights, Article 46, and assume, without deciding, that the *Daiger/Coles/Tayman* principle is applicable without regard to gender. *See Condore v. Prince George's County*, 289 Md. 516, 425 A.2d 1011 (1981). There is no "privileged suitor" because of gender but, rather, the court must look to the need of the party seeking alimony *pendente lite*.

ruling on a petition for alimony *pendente lite*.[3] Thus, we must dismantle the foothold that we created in *Maynard* and then reinforced in *James*. Without that foothold, appellant's contention fails.

Next, appellant maintains that the chancellor erred in awarding $3,500.00 in alimony *pendente lite* to appellee because: (A) appellee was capable of contributing to her own support; (B) she voluntarily impoverished herself; (C) the award was excessive in relation to her needs; (D) the chancellor failed to exercise his independent judgment; (E) appellant lacked the financial resources to cover the award; and (F) the chancellor should not have applied the award retroactively.

Judge Prescott, writing for the Court of Appeals, recited the applicable standard of review.

> The award of temporary alimony is left to the sound discretion of the chancellor upon consideration of the circumstances in each particular case; and, while it is always reviewable upon appeal, the large discretion vested in the chancellor should not be disturbed unless this Court is thoroughly satisfied that there has been a mistake in respect to the amount awarded.

*Moore v. Moore*, 218 Md. 218, 222, 145 A.2d 764 (1958). Regarding the relationships between masters, chancellors, and the appellate courts, the Court of Appeals and this Court have stated, respectively:

---

**3.** In their treatise, *Maryland Family Law*, Fader and Gilbert reach the same conclusion.

> Both *Maynard v. Maynard* and *James v. James* cite the treatise of *Nelson on Divorce and Annulment* as authority for the elements of temporary alimony. Nelson states that a party must show a reasonable probability of success on the merits to be entitled to an award of temporary alimony. Maryland law has never required that proof. Only proof of:
> (1) the marriage;
> (2) the pending divorce; and
> (3) the respective financial circumstances of the parties showing need by one party and ability to pay by the other is required. JOHN F. FADER, II & RICHARD J. GILBERT, MARYLAND FAMILY LAW 135 (2d ed. 1995).

The ultimate conclusions and recommendations of the master are not simply to be tested against the clearly erroneous standard, and if found to be supported by evidence of record, automatically accepted. That the conclusions and recommendations of the master are well supported by the evidence is not dispositive if the independent exercise of judgment by the chancellor on those issues would produce a different result.

*Domingues v. Johnson,* 323 Md. 486, 491–92, 593 A.2d 1133 (1991).

Recognizing that the chancellor must make the ultimate decision while bearing in mind that the master is ofttimes a specialist in his field and thus able to bring valuable insights to the proceedings, it is clear that the chancellor must be granted broad authority to reject the findings of the master in whole or in part and, where it is deemed appropriate, to conduct a *de novo* hearing in any case in which the chancellor is not satisfied that a proper decision can be rendered based on the proceedings before the master. Since under *Domingues,* the chancellor is required to exercise her independent judgment, including matters pertaining to credibility, the chancellor must have the authority to conduct a *de novo* hearing and to make that independent determination from such a hearing where it is felt to be appropriate and necessary.

*Best v. Best,* 93 Md.App. 644, 653–54, 613 A.2d 1043 (1992) (footnote omitted). Armed with our standards of review, we embark upon our journey.

## *A & B*

 From August 11, 1994 to January 27, 1995, appellee remained unemployed. When asked by her counsel why she had not made any efforts to secure employment, she replied, "Because I have no fixed address in which to apply to have a job." She also described her state of health.

Presently I have another lump on my breast which needs to be checked. It was confirmed yesterday that it's there. I

also have to have surgery on my toe, which is going to entail a three- to six-week recuperation. I also have tingling in my hands which is being caused by a keloid that's in my arm from previous surgery.

Appellee, who was in her fifties when she left the marital home, had most recently worked for the family corporation as its vice-president, secretary, and administrator. Although appellee and appellant cashed payroll checks as their needs dictated, for appellee's labors she earned $300 per week.

Marsha Lee Keene, a vocational rehabilitation control expert, testified that, based upon her review of appellee's resume, discussion with appellant, and perusal of the job market, appellee, who had a twelfth grade education, was qualified for positions paying between "upper $20,000, low $30,000." She admitted that appellee's health condition would affect appellee's employability and that she did not have an employer ready to hire appellee.

Apart from the $7,500.00 that she took from the couple's joint account, which she used for legal fees, appellee's financial resources came from a $3,100.00 life insurance policy she cashed, $4,700.00 that she borrowed from her father, $750.00 that appellant gave her to purchase Christmas gifts, and $1,000.00 that he gave her one week before the January 27, 1995 hearing. Appellant attempted to show, without success, that appellee squirrelled away money through secretive banking practices. He justified his refusal to provide her with financial support, aside from the $1,750.00, on that basis.

In his July 28, 1995 Opinion and Order, the chancellor rejected parts A and B of appellant's argument.

> Continuing her employment with the defendant's company does not appear to have been an option for the plaintiff. Given the plaintiff's health, the lack of a permanent place to live and her limited work experience, Ms. Keene's assessment of her employability appears to be overly optimistic. The plaintiff's resume ... does suggest that somewhere down the line she should be able to secure employment. There is nothing, however, to indicate that the plaintiff has

created her present financial situation in order to obtain alimony pendente lite from the defendant. After considering the ten factors set out in *John O. v. Jane O.* ... the Court is of the opinion that the plaintiff at the present time is not voluntarily impoverishing herself. She has a need for alimony pendente lite.[4]

We perceive no basis for parting with the chancellor's decision.

### C & D

■ Appellant argues that the master "randomly accepted and rejected numerous expenses claimed by Mrs. Guarino on her financial statement; and then arrived at an aggregate number as her 'need.'" He suggests that the chancellor, by accepting the master's conclusions, "failed to perform his responsibilities."

In her financial statement, appellee listed total monthly expenses of $6,792.00, broken down as follows:

| | |
|---|---|
| $3,000.00 | house payment or rent; utilities: heat, gas, and light |
| $ 50.00 | car telephone |
| $ 100.00 | telephone |
| $ 400.00 | food |
| $ 350.00 | clothing |
| $ 400.00 | medical and dental |
| $ 300.00 | transportation |
| $ 100.00 | automobile insurance—paid by appellant |
| $ 250.00 | recreation |
| $ 250.00 | incidentals |
| $1,600.00 | taxes on alimony |
| $6,800.00 [5] | total expenses |

Appellee testified that her financial statement accurately represented her financial situation, assuming that appellant paid

---

**4.** The voluntary impoverishment discussion contained in *John O. v. Jane O.*, 90 Md.App. 406, 601 A.2d 149 (1992), pertains to child support. *See* § 12–201(b)(2) of the Family Law Art. This Court has, however, prior to the passage of § 12–201(b)(2), used the concept in the context of alimony awards. *See Colburn v. Colburn*, 15 Md.App. 503, 514–16, 292 A.2d 121 (1972).

**5.** The $8.00 difference is unexplained.

the mortgage and utility payments on the marital home. She admitted that her housing and utility figures, combined at $3,000.00, were estimates and that $2,000.00 to $1,800.00 was probably the appropriate range for those items. As to the other amounts, she testified that her car had 91,000 miles on it, that she was receiving treatment for dental problems, that she had a car telephone, that the clothing estimate was a "pretty good estimate," that the recreation amount was for taking her grandchildren to different functions and for a trip, and that the incidentals amount was an approximation. The amounts or items that were not discussed were the $100.00 telephone figure, $400.00 for food, and the $1,600.00 tax on alimony.

In comparison, appellant's financial statement disclosed the information that follows:

| | |
|---|---|
| $ 671.00 | house |
| $ 200.00 | utilities |
| $ 100.00 | telephone |
| $ 715.00 | food |
| $ 200.00 | clothing |
| $ 200.00 | medical and dental |
| $ 243.00 | transportation |
| $ 55.00 | life insurance |
| $ 32.00 | auto insurance |
| $ 57.00 | other insurance |
| $ 365.00 | recreation |
| $ 639.00 | incidentals |
| $5,469.00 | periodic payments |
| $ 418.00 | house repair |
| $9,364.00 | total expenses |

At the July 19, 1995 hearing on the exceptions, the chancellor expressed his concern with the master's findings relating to appellee's finances.

I have looked at the financial statements, and I know how busy they [the masters] are and how they can't always item by item, say, well, she is entitled to $38.00 for a telephone, et cetera, et cetera, but . . . my problem is to find the basis for a conclusion of $3500.00 or $2500.00 or $2,000.00 or $4,000.00 or anything else.

Before concluding the hearing, the chancellor stated, "I have reviewed the exceptions. I reviewed the answer. I reviewed

the master's report. I reviewed the financial statement." By the time he issued his Opinion and Order, the chancellor had also reviewed the transcript. In that Opinion and Order, the chancellor resolved the financial ambiguities.

The Master did not make detailed financial findings to show how she arrived at $3,500.00 per month as an appropriate amount for alimony pendente lite. However, after an independent review of the plaintiff's testimony and the exhibits, particularly Plaintiff's Exhibit No. 10, her financial statement, the Court is of the opinion that $3,500.00 represents a fair and reasonable sum for the present needs of the plaintiff. The plaintiff's financial statement lists monthly expenses of $6,792.00. This includes $3,000.00 for house payment or rent and $1,600.00 tax on alimony, both of which are inordinate. If these figures are reduced to the more modest figure of $900.00 and $450.00 respectively, this financial statement still supports the Master's conclusion that the plaintiff has monthly needs of $3,500.00.

The record reveals that the chancellor exercised his independent judgment. Applying the reductions he utilized, $2,100.00 from housing and utilities and $1,150.00 from alimony taxes, produces a monthly figure of $3,550.00, which is $50.00 greater than the chancellor's total. The chancellor's statement that the reduced total figure comports with the master's findings does not trouble us because he independently reviewed each item and, apart from the two he modified, found them to be reasonable. In other words, we are convinced that he exercised his independent judgment and did not manipulate his figures merely to match the master's. Moreover, appellee's expenses compare favorably with appellant's. Although we recognize the computational error, we note that appellee does not contest the award. Thus, we are not inclined to disturb the chancellor's judgment.

### E & F

█ Guarino Corporation, a general contractor, specialized in Washington Metropolitan Area Transit Authority (WMA-

TA) construction. Appellant was the president of the corporation and its sole shareholder. According to appellee, although the couple drew salaries, they would withdraw payroll checks as they desired. The couple's joint tax returns for the years 1991 to 1993 reflected income of $205,949.00, $186,493.00, and $66,780.00.

Harvey Johnson, an accounting expert who served as the couple's outside accountant, testified that the corporation's cash balance was approximately $900,000.00 one week before the January 27, 1995 hearing. Although his preliminary projections were that the corporation was going to show a loss on its WMATA contract over the upcoming eighteen months, he was of the opinion that, if the corporation were not to enter into any new contracts, after eighteen months, based upon the working capital and cash balance, approximately $400,000.00 to $500,000.00 would be left, not counting a reserve of $100,-000.00. He supported appellee's statement that the couple would draw extra payroll checks as they needed.

W–2 statements for appellee and appellant reveal that in 1994 the corporation paid her $19,080.00 and him $47,700.00. Appellant's claim that his salary of $900.00 per week is insufficient to cover appellee's alimony *pendente lite* award is without merit. The evidence adduced at the hearing was uncontradicted that the couple withdrew money as they wished.

Q It was the practice of Mr. and Mrs. Guarino in past years, was it not, Mr. Johnson, to draw certainly weekly payroll checks? Is that right?

A That's right.

Q And then to give themselves additional payroll checks for extra things that they chose to do; is that right?

A They would take bonuses, yes.

Therefore, we must reject appellant's claim of penury.

■ Regarding the retroactivity of alimony *pendente lite*, appellant posits that appellee's lack of actual expenses should inure to his benefit. The flip-side of that assertion is that the bane should fall upon appellee. We do not agree.

The purpose behind awarding alimony *pendente lite* would be undermined if we were to follow appellant's approach. Appellee's lack of financial resources prevented her from maintaining any semblance of her previous lifestyle. Her "mitigation" was in response to the lack of resources, the decision being forced upon her. Thus, the chancellor correctly considered appellee's needs and the status quo in calculating the alimony *pendente lite* award.

## II. Attorney's Fees

In his last argument, appellant declares that "[b]ecause the $7,500.00 the Wife paid to her attorney was taken by the Wife from the parties' joint account, Mr. Guarino has already paid some or all of the Wife's initial attorney's fees." His argument is pointedly near-sighted.

We will not disturb the chancellor's award of attorney's fees unless the chancellor arbitrarily exercised his or her judgment or if his or her findings were clearly erroneous. *Lemley v. Lemley,* 109 Md.App. 620, 633, 675 A.2d 596 (1996). Section 11–110(b) of the Family Law Article authorizes the chancellor to award suit money, counsel fees, and costs for reasonable and necessary expenses. Before making such an award, the chancellor must first consider: "(1) the financial resources and financial needs of both parties; and (2) whether there was substantial justification for prosecuting or defending the proceeding." § 11–110(c) of the Family Law Article.

Appellant makes no mention of his appropriation of the couple's joint tax return. Following his reasoning, appellee was supporting him when he utilized those monies. He also suggests that appellee can pay her attorney's fees with the award of alimony *pendente lite* because those monies were awarded for nonexistent expenses and appellee would receive a windfall if she were awarded attorney's fees in addition to that award. Lastly, he complains that it is unfair for him to pay $7,500.00 in attorney's fees when appellee's outstanding bill is only $5,017.50.

Somehow, appellant overlooks the difference between an award for alimony and one for costs. Secondly, he neglects the factors contained within § 11–110 of the Family Law Article.

The chancellor accepted the master's finding that appellee incurred attorney's fees of $12,403.11, $7,385.61 of which appellee had paid, not counting a $2,500.00 retainer for an expert. On the other hand, appellant incurred attorney's fees of approximately $25,000.00, of which he had paid $11,000.00.

Appellee's prior payment of her expenses cannot be counted against her. That is, appellant is not entitled to a credit for payment made by appellee to her attorney. Subsection (c) of § 11–110 specifically provides that the chancellor "may award reimbursement for any reasonable and necessary expense that has been previously paid."

The record supports the chancellor's award of attorney's fees. We detect no reason to deviate from that judgment.

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED; APPELLANT TO PAY THE COSTS.